We'll begin with, I didn't bring my glasses, we'll see how well I can proceed without that. We may take a break after the first one so I can read. We'll start with D.T. v. Cherry Creek School, 21, High Control 605. Mr. Raykin, you ready to proceed? Good morning, Your Honors. May it please the Court, and I would like to reserve three minutes for rebuttal. We'll see. That doesn't always work out. Understood, Your Honor. What does it take for a school to help a terrified mother get help for her suicidal child who is sinking in school in every way imaginable? Emotionally, academically, socially. That's the question that we are here to deal with today. Here we have a situation of a childhood crisis. A school knowing about the child's crises, a mother repeatedly begging for help from the school, and the school being indifferent for months, time and time again. Now, we are here to discuss the special education process. I'm just going to discuss a few of the key elements of it. The law that governs here is IDEA, the Individuals with Disabilities Education Act. Under IDEA, a parent may make a request for a special education evaluation for a child. Then the school has to provide the parent with a form to evaluate the child. Once the parent signs the form, you have 60 days. The school has 60 days to complete the special education evaluation. This evaluation can cover many bases. It's not just about academics. Now, academics is ultimately the end goal, but it could be what's going on with the kids socially and emotionally, in terms of their executive functioning, in terms of their behavior skills. We look at the whole child. Even if the parent never makes a request, every school has something called an affirmative child-fine duty. It's a requirement to identify and evaluate children who are suspected of being kids with disabilities, even if they are advancing from grade to grade. Under child-fine, schools must refer children suspected of having a disability for an evaluation in a timely manner, which never happened here. If a school evaluates a child and finds that the child needs special education services, then that child will receive an IEP, an Individualized Education Program. The IEP is the heart of the services that a child requires when that child has special needs. It is basically a roadmap to identify what's going on with that child and remedy some of the challenges that that child has. If a child has a... Mr. Raikin. Yes, sir. It's Raikin. Yes, sir. Isn't the focus of our attention to be what happened in the school environment? That's our focus, isn't it? Versus problems there may be at home, things like that. So that is part of the focus. One of the things that IDEA requires is that a student with a disability manifest that disability in at least two environments. One of those is the school. Now, here we know unquestionably that the child manifested a disability in the home, but he also manifested it in the school. He went to the school counselor and was saying that he was struggling in his classes. His grades were declining for an extended period. We know that this is a child who in January of 2016 had a GPA of roughly 3.4 and in October of 2016 had a GPA of roughly 2.4. Can't that be attributed to his taking too many honors classes? Well, we don't know that, Your Honor, and let's think about that for a second. Normally with an honors class, there is a recommendation to refer you to honors. And that recommendation only comes if you are already doing well in your regular classes. So if they believe that you have the cognitive ability and the decent work skills to actually succeed in honors, they will make a recommendation for honors. Now, even kids who initially struggle in honors, if they get the proper supports, will actually continue to do well in honors oftentimes. But here, any notion that he was struggling in honors simply because of a lack of any kind of ability is really purely speculative, because here's the thing. While he was in honors and struggling, nobody ever came to him and actually evaluated to see why he was struggling in honors. It's not even that unusual for kids with disabilities to struggle in honors. At that time, was there any manifestation brought to the attention of the school that his lower grades were the result of not getting an adequate education? So that is a big question, Judge Murphy, because this is why you evaluate. What they were supposed to do at that point is try to see, all right, we have a child over here who is not doing well right now, and we put him in honors. We also have a child who is going to the counselor and talking about various things. Well, when you say not doing well, he was getting passing grades. I mean, he was a C-plus between a C and a B on these courses, right? He was getting a passing grade, but remember what the Andrew standard is. The Andrew standard is for a child to actually make adequate progress in light of that child's abilities. What they didn't determine is whether that child was making adequate progress. It's possible that with the appropriate supports, he wouldn't have been a C student and getting passing grades. He could have been a B student or an A student. But this is why you evaluate. Just to go to a larger point, it's not at all unusual for kids to be what's known as twice exceptional. That is those to actually be able to do honors work and advanced work while at the same time having special needs. Those special needs could actually be mental health needs as well. We're talking about two different parts of the brain here. There is the academic brain power to do a lot of the work, but there's also the emotional, mental, and social part of the student. Remember, we're talking about teenagers here. There could be many reasons that this teenager is not succeeding. Yes, there could be many reasons, and those many reasons could be reasons not covered by the statute. Why couldn't one characterize this as a situation of a kid who goes to a bigger school. He has emotional problems at home. He wants to keep doing honors courses because he wants to go to college, but he's not doing well in those courses. Why is this not, and why could this not be characterized as typical teenage angst? I'm not diminishing that. I'm just saying that it does not correlate to a disability. I have a hard time understanding why that explanation would not be a reasonable one to have as a school official. Because even the school didn't categorize it that way, Judge Holmes. In November and December of 2017, they ultimately put this child on an IEP after they did an evaluation. Yes, but your argument is they should have put him on one before then. Yes. And that there were signals before then that would have indicated that he needed an IEP. And the point I'm making is why, based upon the fact that he was having problems at home, he was having fights with his mother, he was doing dope, why would that have led them to believe that he needed an IEP? Because there were also, remember, in April of 2017, he walked into traffic and attempted to kill himself. At that point, their own school psychologist suspected that the kid was depressed and referred him to two different clinics in order to get treatment for depression. Remember, at that point, he was already diagnosed. Subsequently, in September of 2017, he was diagnosed with anxiety and depression. Then, in November and December of 2017, again, he was diagnosed with anxiety and depression. What was different in November as opposed to September and April? The only thing that was different is that, at that point, the school or the student may have made a threat against the school. But there is no requirement in IDEA that what it takes to get an IEP is a threat against the school. Well, of course, and I'm not suggesting that would be the case, but the point is, why wouldn't that be a concrete manifestation of his disability in the school setting? I mean, if he were depressed, well, I mean, the record showed that he was depressed and that he had suicidal ideation. Well, why couldn't that be related to the fact that he was having trouble dealing with the change in his life and having trouble at home? I mean, those things wouldn't necessarily be manifested in the school, particularly since, like I said, it wasn't like he was flunking out. He was a student who struggled and his grades decreased, but he still would have advanced. He did advance. Your Honor, what you're talking about actually is called social maladjustment. And in order for a child to be diagnosed and receive services for a serious emotional disability, that child, those struggles cannot be related to social maladjustment, such as going to a bigger school, such as moving from Florida to Colorado. The school never determined that he was socially maladjusted. If they had, they would have never put him on an IEP in December. Wait a minute. Is there a concrete structural basis, is there a structure in which they would have made a definition or they would have opined that he was socially maladjusted? I mean, would there have been some mechanism where they needed to do that? That's correct, Your Honor. So when you're evaluating a student, you go through a checklist. And one of the questions on there is whether the struggles that the student is having are related to their social maladjustment. If the answer is yes, that student cannot qualify for an IEP. Well, based upon the record, whether there's a checkbox somewhere in the record saying social maladjustment or not, based upon the record, the point would be, is the standard what a reasonable school official would have discerned or suspected, in the language suspected, would have suspected relative to a serious emotional disability? Your Honor, we don't even have to speculate as to that. What happens in an IEP meeting is a team is convened. Usually there's about 10 to 15 members of that team. And that includes mental health professionals, teachers, administrators. And all of those people get input as to whether that student is socially maladjusted and that's the reason. Okay, but then IEP, in this a cart before the horse situation, I mean, the IEP comes once they've made a determination that this child may have a disability, right? Which is what they did after the incident about the school. But you see, sir, this is exactly why we evaluate. It's not as though they couldn't evaluate. They already had information, possibly in October of 2016, maybe in January, certainly by April of 2017, and absolutely by September of 2017, that when they actually did the evaluation, they made the conclusion this is a kid with a serious emotional disability and that serious emotional disability is preventing that kid from accessing education without specialized instruction. That is their determination. Again, Your Honor, the issue is not whether this child actually needed an IEP, but when he needed it. Had they actually done the work in September or April, then we wouldn't be here right now, Your Honor. Let me ask you, as part of the determination of whether he has a serious emotional disability, isn't it in fact the case that one has to see whether this normal generalized interventions that would take place in dealing with these problems would be successful and fail or whether they failed? Two issues with that, Your Honor. Number one, no. In fact, the law specifically says that there is no replacement for special education. Yes, you may try other interventions, general education interventions, including something called RTI, response to intervention. However, they are not actually a replacement for special education. I don't think replacement was in my question. My question was, isn't this a process in which you initially try these generalized interventions to see whether they work, and if they don't work, then you move on to address a specialized intervention based upon the child's disability. I mean, it's a graduated process, is it not? They did, Your Honor. Remember, in April of 2017. Well, they did, and what they would argue is they did right up until November when they decided that he had to have an IEP. But they weren't working. The counselor actually had provided testimony that the child was continuing to regress and continuing to struggle. And remember, actually, in fact, they knew that he had walked into traffic and attempted to kill himself in April of 2017. They worked with him with some kind of intervention. That's what the mother reported to them. They saw the record, Your Honor. She turned over the record to the schools, actually. Remember, it was the school psychologist who made the referral to outpatient therapy. Then they knew in September of 2017 the child had already been hospitalized at Children's Hospital. So if what you're doing in April and May and August and September is not working, then at that point, by all means, test the child. Remember, too, Your Honor, the mother had actually requested a 504 plan, which is a quasi-special education plan, similar to an IEP. How does a child get a 504? Well, first you have to do an evaluation.  Mr. Raykin, what does the record indicate about his attendance? My understanding is that he would miss classes here and there, but it was never the sort of thing where it raised enough red flags at a higher level of intervention. The record regarding attendance, is it about the same from April to October 2017 as it was before? I don't recall that, Your Honor. Isn't that really an important thing to consider, particularly when a kid moves from Florida to Colorado? It is an important thing, but a couple of things. Number one, again, we're dealing with teenagers, and if a teenager is in crisis, it is not at all unusual for that teenager to have difficulty attending school. That actually can be a red flag. Is that your view, or is there an expert in the record who says that? Oh, there's a great deal of information on that, Your Honor. But look, I understand well how the teenage mind works because I was a teacher myself for 10 years, but here's the other thing. What interventions did they actually take to get him to school? Remember, when we're looking at these kids, Your Honor, we have to take a look at everything that's going on with the kid. What do we have here? Depression, suicidality, a new school, declining grades. But our focus is getting back to where we started. It is manifestations of problems in the school setting, correct? Yes, Your Honor. There is a big point here. What the school seems to be arguing is that we will not do anything for a kid, no matter how severe that kid's circumstances are, until that kid makes a threat. Now, that is an extremely dangerous road to go down. Instead, what we should do is actually step in and provide the interventions that are necessary when that kid is in crisis so that something truly awful doesn't happen. And when this kid got the interventions that he needed, he didn't find it. It was my iPad, it was not my phone. I apologize. No problem, Your Honor. I'm curious about our standard of review. Are you asking us to be the fact finder here? No. We actually do not have any disagreement with the facts. We understand that due weight needs to be given to the facts. The issue here is the conclusion that was reached based on those facts. We think the conclusion is where the court erred. Okay. Thank you, counsel. I apologize, Mr. Rankin. It's now on do not disturb. Mr. Hood? Good morning. May it please the court? Morning. My name is Elliot Hood, and I represent the Cherokee School District. We are asking that you affirm Judge Babcock's order in favor of the school district in this matter. Your Honor, this is the first time that this court has addressed the child find issue since Congress reauthorized the IDEA in 2006. And so given that, I'd like to discuss the child find standard, what might prompt a reasonable suspicion of a disability, and further discuss why the record doesn't support Helen's position on appeal. So as we noted in our brief, and there really is no disagreement here, courts have uniformly concluded that the child find duty is triggered when a school district should have reason to suspect that a child has a disability within the meaning of the IDEA, meaning two things. They have one of the qualifying disabilities listed in the statute, and they need special education in order to address the educational impacts of that disability. And what this court was just discussing with Mr. Rankin and what the courts around the country who have addressed this issue have tried to grapple with is, well, what does reasonable suspicion mean? What do educators, what should they be looking for when they have a child who's struggling? And no matter what disability that you're addressing, no matter what disability you're looking at under the IDEA, the analysis is pretty much the same. You're looking for clear signs of three things, that the child has some sort of behavior or condition or characteristics of a condition that is adversely affecting their educational performance, so in the school environment, and that because of that, they need special education, specially designed instruction in order to address the educational impacts of that condition or the characteristics of that condition. Now, the IDEA doesn't define what adversely impacts education, but it basically means that the child is failing to meet the academic and functional demands of school. Well, you take into consideration the student's capacities, so someone who's passing may satisfy the general criteria, but if this is a particularly talented person and isn't performing up to his or her capacity, is that not something to be taken into account? Yeah, you have to look at whether... I mean, if the student's a straight-A student and all of a sudden they're getting straight Ds, that would be a flag, that maybe there's something wrong, something is challenging the child. But that doesn't mean you have to jump to the conclusion that this is a disability under the IDEA. Okay. And to Judge Holmes' point, that's when you implement interventions. You say, okay, the child who previously was getting straight As across the board is now getting straight Ds for maybe some Fs, maybe it's a mix. Wouldn't it be enough just to be dropped from a straight A to a C student? Not necessarily, Your Honor. You have to try and do... I'm saying to initiate some intervention at that point. Well, it depends on the individual needs of the child. You would have to determine whether there's something in the educational environment that you could do. By the way, that could be due to something going on at home as well. A lot of times kids have, teenagers especially, have a lot of challenges, conflict at home, and that could be driving a lowering of grades. And so the school is going to look at what's going on with the child holistically. Okay, let's meet with the parents, let's meet with the child, let's figure out what's going on so we can figure out if there's something we can do within our control to help this kid get back to the place they were before. But in terms of whether that would trigger the child find duty, no. That's way too early in the process to say, all right, we're going to refer this child for a battery of assessments to determine whether they need specialized instruction. Especially if the interventions are, if the child responds positively to those interventions. That's kind of built into the school process. So you're saying that there's intervention before you go to child find. And is that type of intervention, short of that, expected when you have somebody who goes from an A student to a C student and there's a report that he's a suicide risk? So the intervention process is part and parcel with the child find process. Child find is the obligation to identify kids who have a disability and who need special education. But is there an intervention? My point is, before you get to that point, if you have a child who has gone from an A student to a C student, has completed a suicide risk assessment, and it's reported that he's using drugs, do you do something short for that? Does the school intervene and say, what's going on here? Absolutely the school should intervene. Did they do that in this case? Absolutely they did. And what did they do? So at every single stage that this child showed any kind of stress, the school was there to address it. What did the school do in May of 2017? So in May of 2017, when the child was, so the parent had reported that he's struggling in his classes or in English. Well, they need to report that. The school's got those records, so the school knows that. She came to the school and said, my son has been struggling with his honors course load for the last semester, with English in particular. What can we do about that? The school met with her and decided, because of that meeting, that they were going to allow him to retake English over the summer and drop him from honors English to grade level English. But you combine it with, at that time in April, there's not only this dramatic drop in grades, but there's a suicide risk assessment that indicates that he's high risk. And there's a report from home that he's a behavioral problem and he's using drugs. Now, shouldn't there be some further intervention then? So what did the school do in response to the April report from Mom that he had attempted suicide? They met with him immediately, referred him to outside counseling, provided the family with financial resources to access outside therapy, because Mom had sent an email saying we can't afford a therapist. So the school absolutely addressed that problem. Do they do something further then, as this progressed in May, and there was a report of behavioral concerns, including drug usage? They did. So the school counselor, Mr. Giserta, and Dr. Liguri, were meeting with this child repeatedly in the spring. And there was a meeting between either Dr. Nick Liguri or Nick Giserta with DT in May, where he met with them. They decided, okay, he's stressed out about band class, he's having some conflict at home, walked him through some problem-solving coping skills that he could employ in school to make him feel better. And then he sent an email to Mom saying, you know, I met with him, he seems a little down about what's going on at home, but otherwise he seems fine. And actually Mom sent an email asking that Dr. Liguri meet with DT because previous meetings with him had worked. And she expressed in that email, I think that things were improving with him. And then during this testimony, Dr. Liguri said, I agree. I agree with Mom's assessment in her email that DT was doing better. Could you explain what this 504 plan is? A 504 plan, it sounds to me like it's recommended at a step before a determination that there's a serious emotional problem. It's like before you cross Rubicon, you cross the tributary, which is this 504. Is that correct? That's an interesting way to look at it. So 504 plans and IEPs are different. So Section 504 and the IDEA have, they, well, Section 504 exists to ensure that children with disabilities as defined under that statute have equal access to their education. And the standard for schools is to provide reasonable accommodations for children who have a disability under 504. And that typically comes in the form of a 504 plan, which is a written accommodation. Does the record indicate why they didn't adopt a 504 plan in October? Yeah, it does. What was that? So what happened was on October 11th, a Wednesday, Mom emailed Dr. Liguri saying, I'm worried about DT. I'd like to meet on Friday and discuss a 504 plan. And Dr. Liguri responds, we can't convene a formal 504 meeting that quickly, which would require them to assemble a team of people familiar with the child to determine what kinds of aids and related services he would need. But let's meet on Friday to discuss what he needs right now. And during the testimony at the due process hearing, Dr. Liguri testified that he met with Mom. They discussed what was concerning her. And what it turned out was concerning her was something very specific, that DT was having trouble organizing himself in school and managing his time. And so in direct response to that, Dr. Liguri referred DT to Susan Lewis, who was at that time a special education teacher, but she also provided help to general education students like DT to help them with organizational skills. So what he did was the equivalent of what a 504 plan would have been. Recall, a 504 plan is when you provide reasonable accommodations that a child needs to equally access school. So in that setting, what he needed right then was precisely what he got as a result of that meeting. To equally access school, but part of that description had embedded it in the notion that there was a disability to accommodate. And so is there a predicate finding of a disability that goes along with the 504 plan? And if there is, why wouldn't that have speeded down the road to the determination that he needed to have some sort of other plan? So if there was a formal 504 meeting where the educators at the school who were familiar with DT had issued a plan, there would have been a predicate determination that he was a child with a disability under the section 504. But that's not the same as a child with a disability under the IDEA. And oftentimes, as is clear in some of the case law where there's a child find issue, section 504 plans take time to implement and that actually might have delayed the inevitable referral for an IEP, for an IDEA evaluation because if you implement a 504 plan, you want to see if the accommodations are working. So it would not necessarily have speeded the process to get an IDEA evaluation. So, Your Honors, I want to, in closing, I've only got a couple of minutes left, I want to just clarify that the record shows that the school staff at Cherokee Trail High School was responsive to both DT and his mother at every single turn. Every email was responded to. Every meeting request was honored. The school staff were trying their best to address the needs at the time as they saw them. I don't think that's why we're here, though. I mean, that's not their view of why we're here. And so the question I would have is, why are they wrong when they say that the only thing that prompted an IDEA plan was the notion that he threatened to shoot up the school? I mean, surely something short of threatening to shoot up the school will be viewed as a concrete manifestation of a disability in a school setting. I assume you agree with that, right? I absolutely agree. Okay, then why isn't there something that is in the record now that is a concrete manifestation that he had a disability? I mean, surely he did a lot of stuff during all these interventions by the school with him to indicate that there was a problem. A couple of reasons. So as I was discussing earlier, the things that trigger reasonable suspicion are three things. You've got a condition. In the case of SED, it's a durable, serious condition that's adversely affecting the child's educational performance, and they need special ed. Okay, so those are three things. At no point before November 10th of 2017 would there have been a reasonable suspicion that he had a condition that was adversely affecting his educational performance and he needed special education. And if you look at the case law, that it applies the concept of adversely affects education, it's always are they meeting educational standards or not? Are they failing? Are they passing? Are they making progress toward grade-level standards, or are they not? Is that key to the student's individual capacities? No. In fact, a couple of the cases we've cited, including the Scarsdale case, the court was very specific in saying this child wasn't performing as well as she would have liked and to her potential, but that's not the inquiry. The inquiry is, is the child getting educational benefit from the programming that she's receiving? Is she meeting educational standards? And while her grades had dropped from where they were before, it wasn't nearly at the point it needed to be to trigger the adverse educational impact that the IDEA requires. Can you think of an example of what would trigger, in this case, SED short of a threatened shooting? Yeah, so I can think of two kind of alternative fact patterns. One is, instead of, now all of the records show that he maintained a C or C-plus average throughout. In fact, his grades when he was evaluated were even a little higher than that. So if his grades had plummeted, truly plummeted in the fall, around the time that he had expressed suicidal ideation, and the interventions that had been tried in April had not worked, so in response to the previous suicidal ideation, they had tried counseling and that hadn't worked. They had tried academic interventions that hadn't worked. I think that at that point, that probably would have triggered. So you're saying the record indicates some of these interventions, short of SED, indicated some progress? Absolutely. The record indicates that? The record does. All right, thank you. Thank you. I'll give you a minute, if you'd like it, but not more. Don't. Yes, sir. Thank you. First of all, the record does not indicate any progress. Let's focus in on something that's very important here. His academic performance was no worse in November and December of 2017 than it was in September of 2017, than it was in April of 2017, than it was in October of 2016. Again, the only factual difference that we have here is that there was a threat made against the school, and that's what actually prompted the school into action. Another thing, they keep talking about how these other interventions worked. How? By a relay to a mother? Well, I think he's doing well. If they were working so well, then why was this child hospitalized in September for five days at Children's Hospital after additional suicidal ideations? I don't know what they consider to be working, but that doesn't seem to be working to me. His grades weren't going up. His attendance was no better. His attitude was no better. His outlook on life was still actually quite bad. They basically waited until things just got much worse. Are you saying the record indicates there was no progress? There was no progress, Your Honor. Absolutely. With these interventions? None at all? Absolutely not. If there was progress, Your Honor, he wouldn't have been hospitalized in September. Okay. Would you characterize the record during that period as showing that there was degeneration, or was there maintaining status quo? It was somewhere between the status quo and degeneration. But I will say this, though, Your Honor. Again, it was no worse in November and December than before. There was nothing new with respect to him except for the threat. Well, that may just indicate the SED program is not working either. Your Honor, at that point, didn't you escalate the interventions? Once he got to the new school, his grades went up by a full point, and he never had another threat again. And he was on an IEP at that school. Thank you, counsel. Thank you, Your Honor. Thank you, counsel. The case is submitted. Counsel are excused.